May it please the court. My name is Gary Gorski. I represent the appellants in this case. And before I begin, I would like to place this case in its procedural posture. First, the state of California was dismissed on a 12b6 motion at the very beginning on the pleadings. On that motion, we filed a counter motion on the facial challenge of the statute in question in this case. That counter motion was denied as well. Afterwards, discovery was conducted and a motion for summary judgment was made by the defendants, County of Sacramento, and Sheriff Lou Blanas. On that motion, there was also a counter motion for summary judgment as well, for both a facial challenge and as an applied challenge to the statute and the CCW laws in question. Prior to that time, the Heller decision had not come out. So the lower court decision was based on current Ninth Circuit precedent at that point in time. That precedent has now changed with the Nordyke decision, which has incorporated the Second Amendment and made it held applicable to the states. So now my opening brief, which dealt primarily with incorporation, has substantially changed. I understand a judge sitting on the circuit asked for en banc review of that, and that's for something to be determined at a later point in time. But that's procedurally where we're at. I'd also like to reserve 10 minutes of time for rebuttal. That gives you three minutes? That only gives you three minutes to argue. I'm sorry. Okay. Five minutes of rebuttal time. I apologize. You have to keep track of your own time, because that's the total amount you have. Okay. First, we would argue that in this case strict scrutiny applies. It applies primarily because we have a fundamental enumerated right under the Second Amendment, and also because it's similar to the dual constitutional inquiries conducted by the Supreme Court involving fundamental rights. What does Heller have to do with concealed weapons? I thought Heller was you're talking about your constitutional right, I assume, is interpreted by Heller. And Heller applied to having guns in the home. Well, it also held that it's an individual right to protect oneself, too, for self-defense. But that there are certain regulations and requirements that can be established, and it did not go so far as to detail those. So I find it a little surprising that you're seeming to think that Heller gives you a clear road to victory. No, I don't think he gives us a clear road to victory. But what it does do is requires the State to have a statute that's narrowly tailored. If they're going to take on the right to protect themselves. Well, but it becomes a circular problem, because it depends what the right individual right recognizes. This is what I understand your atrocity saying, what the individual right recognized in Heller was. If the individual right recognized in Heller is essentially a homebound right to self-defense, it doesn't have much to do with the right to walk around the streets with a concealed weapon. Well, that wasn't just homebound defense. It had the right to self-defense. But didn't Nordyke essentially say that Heller was limited to the right to have a gun in one's home to defend oneself? Well, Heller also meant. Isn't Nordyke against you on that question? Yes, it did, Your Honor. But also Heller went on further to say there are certain State restrictions, such as the restrictions on concealed weapons, convicted felons possessing firearms, the mentally incompetent or mentally institutionalized. But the issue, though, is that gray area, and that's what we're talking about here, where you have a statute that's sufficiently vague and ambiguous when you're talking about regulating a fundamental right, that it has to meet strict scrutiny standards. The statute as written and as applied is too vague to meet the strict scrutiny standards, and that's the thrust of the argument. Heller did not go out and define the outer parameters or inner parameters of what that right is. They left it up to the circuit courts to decide, and maybe later on down the line they will have another case on this issue. But at this point in time, this circuit court has the opportunity to review California concealed weapons laws. And it's not just the CCW laws as written, but it's also as applied under the equal protection analysis, which is the thrust of our other argument. They coexist with each other. The equal protection argument is so strong in this case that it's clear from the evidence that we have produced that campaign contributors obtain concealed weapons permits at a higher rate with a lesser standard or no standard at all than others who are well qualified to receive a CCW. And the lower court order completely ignored one critical issue. Our expert witness's testimony on that point, the order completely ignores our expert witness who was a 32-year veteran on that sheriff's department, part of their management team, and he opined that there was no good cause standard in the department. And so we're looking at the lower court's decision. Kagan. Oh, there was a good cause standard. There was a very well set out set of standards that Sacramento was applying. Now, you're saying they didn't really apply them, but that's sort of a different problem, isn't it? Well, they didn't apply them because, for example, you have, I mean, we can go down the list, a Jack Kimball, for example, a campaign contributor, his justification for receiving a concealed weapons permit was two words, self-defense. Now, it seems natural if you're applying for a concealed weapons permit that you're doing it because it's for self-defense purposes. But why is it that individual is judged with two words where other well-qualified applicants, such as the declaration of attorney Rothery, who applied three times, who was, who showed that he does conviction or eviction notices, collects rent, carries money, and in that particular situation, he was denied a CCW on three separate occasions. So you have a disparity of treatment there that's clear. Is this a class action? No, it is not. So what's the relevance of all that? I mean, you're two people. One of them didn't apply, and one of them, it's hard to quarrel with them being rejected. So what's the relevance of who else was rejected or wasn't rejected? It's because you have to show a longstanding custom policy and practice under Mornell to establish that the sheriff's department and the sheriffs, the sitting sheriffs have a ---- First of all, certainly a large number of people who were campaign contributors got permits, yes? Several hundred. Pardon me? A large number of people, several hundred at least, who were not campaign contributors got permits. 229 individuals, according to Sheriff Flannis in his declaration, received CCWs. Now, also in his declaration, he never once mentioned whether he knew those individuals. He never once mentioned what the good cause criteria was for their issuance. But we have set out in the evidence that numerous individuals have received concealed weapons permits when they didn't even fill out a Section 7 on the application Now, the record is clear that the lower court, for example, in dealing with Appellant Lau, who is a former FBI agent, and I think the record is well established that he served 14 years in China. The record is also well established that the FBI had taken his gun away from him before he even left the FBI, and that he suffered from depression, that he had a conviction for shoplifting. And if you look at the denial of his permit, looking at the evidence presented of him as an individual, isn't it well within the established guidelines, whether you say they were followed or not? In this case, if they were followed, it was well within those guidelines to deny him the permit. Well, that would be true, Your Honor. But the problem with that argument is that his denial letter mentioned nothing, nothing about what you just stated. All it said was he did not show an immediate threat of harm. That was the initial denial letter. He filed an appeal where he submitted numerous documentation. The denial on that appeal once again said he did not show immediate threat of harm. And the FBI did not indicate that he was under an immediate threat of harm, right? Well, though the question was true with former agents who apply to carry concealed weapons, that we support this. The FBI did not support his application, did they? But is that required under the CCW statute? It's not. I don't know why you're complaining about that, because it implies that if there were a threat of harm, you might be able to get a license. If they had said we're doing this because you've got all these things on your record and we can't possibly give you a permit, then he would be forever disqualified. So I guess I don't know. Mr. Lau was in a unique situation, Your Honor, in that he's his security claims that prohibit him from talking to anyone about what his work entailed. And the FBI is not going to come out. In the real world, the FBI is not going to come out and say, hey, here's your threat of harm. Here's what he was doing over the last 14 years in counterintelligence. But regardless of what you say, he was denied. At least the piece, the form of the application that we have, which says denied, then sends on too many issues. Was that not the reason for the denial? And apparently what they meant was this. That's a note on a form that Mr. Lau never received. The actual denial letter itself said that you did not show immediate threat of harm. It mentioned nothing about too many issues. And so that goes to due process. How was he placed on notices to the reason for his denial? The actual denial letter itself said you did not show immediate threat of harm. In other words, the county used post hoc reasoning to substantiate their position on summary judgment, not at the time of the denial of his CCW. I would like to reserve the rest of my time at this point. Thank you. Good morning, judges. My name is John Lavra. I represent the appellees, Sacramento County and former Sheriff Blanus. After discussion with the Attorney General's office, we've decided to split our time with me taking five minutes and the Attorney General's office taking ten minutes. If that works out, that's what I'm going to do. Can you tell us something about the record with regard to the issuance of these permits? I don't mean the regulations, but there's representations being made about a pattern with regard to the issuance. You say in your briefs that there's no authority for the ground, that that would be a violation, but it would be. I mean, there's certainly some ñ there's a whole lines of cases saying that to turn government and to turn privileges on contributions to public officials would be a problem if we're proven. Do you agree with that? Yes. All right. So the question is, but you say it wasn't proven. And the question is why? Well, because I ñ with respect to ñ there's two different plaintiffs here. But with respect to Mr. Lau, whether or not you ñ and Mr. Mell, for that matter, whether you have a policy that's unconstitutional or constitutional or legal or illegal, the ñ in my view. Well, I understand that with regard to Mr. Mell, because he never files out an application. But it's less clear with regard to Mr. Lau. So assume for now that he does have standing, that that ruling is wrong. Okay. Then the question is, has he made out a case with regard to a discriminatory practice here, a First Amendment-based discriminatory practice? I don't believe he has. And the reason is that the undisputed evidence as to why he was denied the permit is what is set out in the brief. Now, appellants can ñ Well, apparently it's really not true, because he was told that it was because he didn't show a ñ that he was in danger. But it seems plain from the little note that that wasn't why he was denied. But if you look at the declarations that were submitted and not disputed on the summary judgment motion from the individual panel members, if they first go through a three-person panel, and that was Captain Lind and Kelly and Kluge. Why would they tell him something else then? Well, they wrote down too many issues on the form. That's what they told him, though. But they told him it was because you didn't show that you had ñ were in danger. Well, what happens is they basically have a form letter that goes ñ that goes out. And if you look at the declarations of the three panel officers and the appellate counsel, the appeals hearing officer, Chief Harris, they say we considered in determining whether or not to grant the permit to Mr. Lau to carry a loaded weapon in public, we considered everything that was in the application and in the packet that was provided to the department. He doesn't really make this argument. But how was he supposed to appeal when he was told X and the real reason was Y? Well, he was entitled to ñ when he appeals, he gets a de novo appeal. So he's entitled to go to the appeals officer, and the undisputed evidence is that it is a de novo appeal, and that the appeals officer doesn't say, bring on everything you have, I'm going to independently consider whether or not you should have a permit. And that package, which is in the record, has all of the information. Mr. ñ the appellant says, well, it's post hoc information. That's not accurate. The information about him suffering from depression and having a mental instability and having his gun yanked by the FBI and on medication and all ñ and being arrested, all of those issues were in the packet that was provided to the appeals hearing officer. And his declaration, which is undisputed, says I considered all of those issues. Sotomayor, is your basic position that even if there was such a discriminatory policy, he wasn't affected by it, is that your argument? That's part of it. Or that there wasn't one? Both. All right. So I'm still trying to find out why there wasn't one. Why there wasn't a discriminatory policy? Right. Well, because the policy here on the issuance of these permits was undisputed, and that's the process of submitting an application, having it completed, having the DOJ check, having a policy in place whereby the sheriff as an individual is taken out of the decision. It's assigned to a three-person panel. This was something that was developed in conjunction with citizens groups and other government officials determining how can we best consider what is a real important safety issue, public safety issue, and it was decided here's the practice we're going to use, this three-person panel. The panel will not be the ---- consist of the sheriff. The panel does not know whether anyone's a particular campaign contributor or not. There's then in the hearing an opportunity to appeal. If they are granted the permit by the panel, they are fingerprinted and they go through firearms training. That was the policy, the undisputed policy that was in place at the time that Mr. Lau applied for his CCW permit. That's the policy. And the department contends that that policy is not discriminatory. I mean, there is evidence, undisputed in the record, that people who contributed to the campaign of a sheriff did not get weapons. People who did not contribute got weapons permits. People who contributed to the campaign and then sought renewal of weapons permits were denied permits. I mean, when you ---- and all of that is undisputed. When you stack up that undisputed evidence, I believe the only conclusion you can come to is that the policy itself is not discriminatory towards those persons who do not contribute to a campaign. And I'm at my cutoff spot. Thank you. Roberts. May it please the Court. My name is Jeffrey Graybill. I'm a Deputy Attorney General of California, representing appellee and defendant Attorney General of California. As has already been pointed out, we were dismissed from this action in September of 2004 for lack of standing on behalf of the plaintiffs to challenge the statutes in question here against the Attorney General. And I'd like to address two points that are related to the district court's decision updated to the Heller conditions situation. And the first issue is that there is no constitutionally protected right to carry a loaded, concealed firearm in public. And the second issue I'd like to address is that appellants don't have standing to litigate that issue in the context of this case with the Attorney General. And moving to the question of a Federal right, the Heller case is restricted to carrying an operable handgun in the home for self-protection. There is no broader right circumscribed there. In fact, in reaching that core right, the Supreme Court hemmed in that right with acknowledged areas of legitimate State regulation, and one of those legitimate areas of State regulation is to outright prohibit the carry of concealed weapons. The Heller court also dropped a footnote to the effect that those specifically enumerated areas or mentioned areas were not meant to be exclusive. So Heller does not aid the appellants in their facial attack on the statute. But the problem is, I guess, Heller said that, but the issues weren't directly before it. And so the question is, what do we take from that? Do we take from the opining in Heller that the right doesn't extend to these things or that the right is regulable? And then you have to get into the whole standard, you know, what standard is applicable to such restrictions, which Justice Breyer took the majority to task for, for not describing. So it seems that we have to choose between those two readings of Heller in order to get any place in this case. Judges, Judge Berzon, the Nordyke panel wrestled with that and came down the same way the Supreme Court did, which was, here's the core right. If what the State is doing doesn't impinge on that core right, we don't have to reach the issue of what standard should what. And the core right is, what, self-defense in the home or self-defense in the home in business or what? California goes beyond what the Heller core right is. California allows use of a loaded concealable firearm in the home, in business, and in property owned by the individual. It's not subject to prosecution for uses of a weapon in that context. So that goes beyond the core right that has already been acknowledged by Heller. Judge Berzon, as you were pointing out, this is a 5-to-4 decision, and I think it had to be carefully crafted to limit the extent of the right. And I think that message was picked up by the Nordyke panel, and by the Nordyke panel. Sotomayor, it talks a lot about the home, too. Yes. Yes. And so the Nordyke panel's conclusion was, since it didn't infringe on that particular area and was in a recognized, traditionally recognized area of state regulation, there was no infringement. So you didn't reach the question of what standard the state has to reach to regulate in that area. And I think there was a very strong message and hint in Heller. It was beyond a hint that there's this longstanding recognized right amongst States with Second Amendment-type provisions in their own constitutions to recognize that the State has a right to prohibit, notwithstanding that Second Amendment-type provision, to prohibit outright the carry of concealed weapons in public. And I think recent events have demonstrated the wisdom of that right of the State to regulate in that particular area, even to the extent of prohibiting it outright. But we don't have to reach that particular issue at this point, because Heller, as it stands, restricts only or restricts the State's right to intervene in the situation where there is a need for a weapon for self-defense in the home. And so Heller does not abrogate this Court's existing decisions in Hickman to the effect that until Cruikshank and Presser are overruled by the Supreme Court, there is no incorporation of the Second Amendment anyway. I realize the Nordyke panel has taken a different view. Well, do you think we have to hold this case for the conclusion of en banc proceedings, if any, in Nordyke, or do you think we can proceed? Your Honor, that's a question of the Court's rules. It's my understanding that we don't have a rule about that. Yes. It's my understanding that Nordyke is not final until the mandate issues and the request for a vote by one of the judges. What I'm asking is this. Do we need, in deciding this case, to know the answer to the question of whether there's incorporation? No. Because Heller does not extend a right in any event. Whether the Nordyke Court chose or the Nordyke panel chose to address that issue, but given the result it ultimately reached, it may not have been necessary to do that. And so this panel, unless there's an en banc ruling, could I suppose decide that that's dicta, but that's for this Court and we're not really expressing an opinion. But more than that, you're saying, well, we could simply assume that that's incorporation but still decide that they, that the plaintiffs lose. Correct. Correct. And in the 45 seconds I have left, I would like to explain the significance of this to the lack of standing by plaintiffs to challenge the statutes, which they did, which was these statutes do not, the statutes that they challenged, did not criminalize the use of force. They provided exemptions from the enforcement of the concealed and loaded weapons. That seems a little tough. I mean, obviously, their interest is in being able to carry the weapons, and if they could carry the weapons, in one of two ways, either by validating the prohibition on them doing so or by coming within an exemption. That's true, Your Honor. I notice my time has elapsed here, but to answer the question. Please answer the question. The – without a legally cognizable injury, there's no standing. And because of the heavy restriction on them. They have a legally cognizable injury. Their injury is I want to carry a concealed weapon and I can't. Why can't you? For two reasons. The statute, the State has a provision that says you can't carry a concealed weapon. True, it has exceptions, but they won't let any exceptions. So I have a problem. Well, under this Court's approach to injury in Hickman and Silvera, if there's no legally cognizable injury, then there's no injury for the person. You're saying – you're trying to resurrect Silvera and say they have no legally cognizable injury because it's the Second Amendment and the Second Amendment doesn't give them any individual right? Is that what you're saying? Yes, because of the way Heller circumscribed the Second Amendment right. All right. But then we're doing the merits and standing all in one piece. It's just so. Yes, that's what Silvera did. All right. Thank you. Thank you. Addressing that last issue, Your Honor, in Silvera, they also did strike down a portion of the Assault Weapons Act under Equal Protection Grounds that exempted retired law enforcement officers, which is the identical issue we're raising in this case. And for the evidence that we have to support why there's no – even under a rational basis test why retired law enforcement officers should be given preferential treatment over the average citizen, it can be found simply at an assertive record at 1252 ending at 1259. There we ask for the production of documents of all evidence showing that retired law enforcement officers are somehow subjected to a greater rate of crime or threat of harm than the average citizen. They produced none and said, in fact, there are none. So there is no rational basis for that law as to why an honorably retired law In fact, to the contrary, a law enforcement officer could work for 19 years and be laid for work six or seven times and get fired from their job and not be honorably retired. But that officer would not be entitled to a concealed weapons permit for life. What has changed if the rationale is that that officer's life is threatened? Nothing. So there is no rational basis, regardless of the way you look at that statute. Judge Bresan, I believe you said Mr. Mell only applied once. And his application was twice. And I understood that he applied twice. Right. And what I want to make sure that we're clear about is he applied the first time and, as Matson required, he challenged the way the thing was handled because the specific application says on it that Yes, but in the end he was told you can come down here if you want and he didn't. Right. On the first time. But then a year later, after they cashed his check, he resubmitted the application. And this is the important part that the lower court missed. And it's found at Supplemental Excerpt of Record 151, paragraph 6. When he submitted that application, they did not say come down for an interview. They summarily denied it. Now, we have the testimony of Amber Wong, who processes applications, and she testified at that time in 2003 the proper procedure was for someone to contact him for an interview or to schedule him to come down for a meeting. That never happened. So he found appeal? No, he did not. All right. Okay. And then in this idea that the sheriff never gets involved, the record is clear that there's multiple documents showing that the sheriff personally approved applications. One was Edwin Gerber. Mr. Gerber is a personal friend of the sheriff, and he applied orally without submitting a written application and a CCW was issued to Mr. Gerber without an application. Now, that is very important because the oral application of Mr. Gerber was made prior to him submitting a written application, but the CCW was approved at that point in time. So there is differential treatment. All right. Thank you. Thank you. The case just argued is submitted for decision. That concludes the Court's calendar. The Court stands adjourned. All rise.
judges: Schroeder, Berzon, Roth